## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 14 2021, 8:39 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Lisa Diane Manning
Danville, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re the Termination of the Parent-Child Relationship of:

A.C. and G.C. (Minor Children),

and

S.I. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

January 14, 2021

Court of Appeals Case No.
20A-JT-1328

Appeal from the Putnam Circuit Court

The Honorable Matthew L. Headley, Judge

Trial Court Cause Nos.
67C01-2002-JT-3
67C01-2002-JT-4

**Weissmann, Judge.**

During her fourth CHINS cases arising from drug use and domestic violence, Mother was finally able to articulate how these conditions adversely impacted her children. But she continued to see her abuser—the children's father—at great risk to herself and her children. He had not sought the substance abuse or mental health treatment she knew he needed, but she continued to call him, and FaceTime him, and let him into her home. Even after he kicked her door in and ran away with her son, even after he caused a police standoff outside her home, she continued to make excuses for him and seek his company. As a result of the children's repeated exposure to domestic violence and Mother's inability to change the circumstances leading to their removal, the trial court terminated her parental rights. Finding the trial court's termination order was not clearly erroneous, we affirm.

# Facts

S.I.'s (Mother's) history with DCS dates back twelve years and includes five CHINS determinations for different combinations of her four children. The common themes in these proceedings are domestic violence and marijuana use. Not all of the domestic violence allegations involved the abuser relevant to this case, K.C. (Father). For instance, in 2008, police arrested Mother for allegedly biting, hitting, and bruising the father of her now 12-year-old child. Most recently, Mother's infant was adjudged a CHINS in April 2020 due to Mother's brief marijuana relapse and her continued contact with Father. Neither her 12-year-old nor her infant are part of this proceeding.

[3]     This the fourth CHINS case. In August 2018, the Indiana Department of Child Services (DCS) removed A.C. and G.C. (Children)[1] from Father because he battered Mother, broke into her home, and abducted G.C. Father acted in violation of a verbal no-trespass order from law enforcement. In October 2018, DCS also removed Children from Mother because G.C. reported that Father had been in the home, and Mother tested positive for methamphetamine. Finding that Children were neglected and unsafe, the trial court adjudged them Children in Need of Services (CHINS) that same month and they were placed in their paternal grandmother's care. In December 2019, Children moved with their grandmother to Kansas, where they still reside. On February 14, 2020, about fifteen months after the children were removed, DCS filed to terminate parental rights.

[4]     In May 2020, the trial court terminated both parents' rights. As to Mother, the court concluded there was a reasonable probability that the reasons for removal would not be remedied, a continued relationship with Mother posed a threat to Children, and termination was in their best interests. These conclusions were based on Mother "continuing to engage in a relationship with her abuser and use THC." Appellant's App. Vol. II p. 179. "Because [Father] failed to avail himself of services offered to him and has abandoned the Children in the process," the trial court found "Mother's continued involvement with Father

---

[1] A.C. was born on January 23, 2014. She was four years old at the beginning of this CHINS case. G.C. was born May 19, 2016. He was two years old at the beginning of this CHINS case. They are now six and four years old, respectively.

dangerous, neglectful, and a continuing barrier to reunification." *Id.* at 180.
Mother alone appeals.

# Standard of Review

The United States Constitution protects parents' interest in the care, custody, and control of their children. *In re I.A.*, 934 N.E.2d 1127 (Ind. 2010) (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). However, these rights are not absolute. The State may terminate parental rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008).

In our state, a petition to terminate parental rights must allege, in relevant part:

> (B) that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the trial court finds these allegations are true by clear and convincing evidence, it shall terminate the parent-child relationship. Ind. Code § 31-35-2-8; Ind. Code § 31-37-14-2.

In reviewing the termination of parental rights, we do not reweigh evidence or judge witness credibility. *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016) (citing *In re I.A.*, 934 N.E.2d at 1132). The judgment will be set aside only if it is clearly erroneous. *Id.* We apply a two-tiered standard of review: first, we determine whether the evidence supports the findings and second, whether the findings support the judgment. *Id.*

# Discussion and Decision

[7] Mother contends the trial court erroneously terminated her parental rights because she is a survivor of domestic violence and because the court significantly ignored her efforts to comply with DCS's recommendations. Additionally, she argues that termination was not in Children's best interests and that the plan for Children's care is unsatisfactory because Father will be able to access them through his mother, with whom they now reside. Because Mother does not challenge any of the court's specific factual findings, we accept them as true. *See McMaster v. McMaster,* 681 N.E.2d 744, 747 (Ind. Ct. App. 1997). We conclude that the trial court's findings and judgment are not clearly erroneous. Accordingly, we affirm the termination order.

# I. Remedying of Conditions and Threat to Children

[8] Mother argues that her rights were terminated because of her status as a survivor of Father's violent behavior. In doing so, she challenges the trial court's conclusions that it is reasonably likely the conditions resulting in removal will not be remedied and that continuing a relationship with Mother poses a threat to Children.

[9] This is Mother's fourth CHINS action, the first of which began shortly after the birth of her eldest daughter in 2008, when she was arrested for biting and hitting the child's father. She then began a long-term relationship with Father who has abused Mother for about seven years, often in the presence of Children. He has broken into her house, set her curtains on fire, slapped her, strangled her, attacked her sister, and abducted G.C. In one instance, Mother's sister hit Father in the face with a frying pan lid to fend off his attack. Father has refused to participate in a batterer's intervention program and failed to pursue mental health or addiction treatment.

[10] Despite Father's resistance to help and his violence towards her, Mother continues to allow Father into her life and make excuses for him. At the termination hearing, she explained away Father's standoff with multiple police officers as a misunderstanding, claiming Father "just wasn't ready [to come out of the house] yet." Tr. Vol. II p. 30. She diminishes the impact of his violence on Children by saying they were too young to remember or were asleep at the

time. And she continues to allow Father contact with Children in contravention of court orders intended to protect them from Father's violence.

[11]     Although the trial court may have used some questionable language in describing Mother's situation,[2] Mother's rights have not been terminated because she is a survivor of violence. Rather, Mother's long-standing inability to distance herself from her abuser and provide children with a home free from violence spurred termination. In its conclusions, the trial court observed:

> Although it is true that Mother made some progress in the case, her safety and security is at risk because of [Father]'s refusal to seek treatment *and her repeated unwillingness to cut him out of her life.* Because he failed to avail himself of services offered to him and has abandoned the Children in the process, the Court finds *Mother's continued involvement with Father* dangerous, neglectful, and a continuing barrier to reunification.

Appellant's App. Vol. II p. 180 (emphases added). Mother may not have instigated the violence, but she failed to make lasting efforts to provide Children with a safe home. Without treatment, Father is a bomb that could go off at any moment, and Mother often placed Children within the blast radius.

---

[2] When terminating parental rights of a parent based on their failure to remove children from an abusive environment, trial courts should be wary of using language that does not accurately reflect the dynamics of abusive relationships. Indeed, abusive relationships are not a "lifestyle" and victims do not "choose" abuse. Appellant's App. Vol. II, pp. 176, 179. Though trial courts must put the safety of the children first, we encourage trial court judges to avoid language that blames victims for the abuse they suffer. The National Coalition Against Domestic Violence is a valuable resource for those looking to update their understanding of abusive relationships.

[12]     Mother alleges she did make some efforts, doing "everything requested by DCS to reunify with her children." Appellant's Br. p. 18. Though Mother diligently participated in counseling sessions and visitations, the trial court found she was overall noncompliant with the dispositional decree. Appellant's App. Vol. II p. 169. She failed to comply with the trial court's other orders, including adhering to no-contact orders, providing a safe home for her children, and finding steady employment. Exs. Vol. III, pp. 210-12.

[13]     Most significantly, Mother continued her contact with Father despite his unwillingness to change. Among other things, Mother facilitated contact between Father and Children outside the therapeutic setting. She allowed Children to FaceTime Father in violation of a court order. She posted pictures with him on Facebook. All the while, she knew Father had not sought the help she acknowledges he needs. Mother's therapist at DCS testified that, although Mother understands the importance of gaining independence from Father, she has so far been unable to "put [that understanding] into action." Tr. Vol. II p. 51. As another DCS worker put it, Mother "can say the words, but her actions in her life reflect differently." Tr. Vol. II p. 167. Even during the termination hearing, Mother continued to make excuses for Father's behavior and asserted that she plans to co-parent with him. *Id.* at 45. She continued to demonstrate a lack of understanding of the issues leading to termination of her parental rights.

[14]     Mother's stilted progress may be a reflection of how effective Father's abuse has been. Abusers often alienate their victims from broader support networks, cultivate a sense of helplessness in their victims, and use finances to solidify

control. *Dynamics of Abuse*, National Coalition Against Domestic Violence, https://www.ncadv.org/dynamics-of-abuse (last visited Dec. 18, 2020). It takes time for victims to extricate themselves from their abuser's control. But in the context of parental rights termination cases, children are our governing concern. They need a safe place to grow up. Simply stated, children cannot wait indefinitely for their parents to work toward preservation or reunification—and courts "need not wait until the child is irreversibly harmed such that the child's physical, mental, and social development is permanently impaired before terminating the parent-child relationship." *In re E.M.*, 4 N.E.3d 636, 648 (Ind. 2014) (citing *In re K.T.K.*, 989 N.E.2d 1225, 1235 (Ind. 2013)). Children have already suffered: six-year-old A.C. has seen a therapist to "process the trauma that she's been in." Tr. Vol. II p. 129.

[15] Trial courts must consider a parent's fitness at the time of the termination hearing, as well as any past behavior. *R.H.*, 892 N.E.2d at 150. Evidence that Mother continues to see Father, though he has not made any effort to improve his behavior, supports the court's dual determinations that there is a reasonable likelihood the conditions leading to Children's removal will not be remedied and that continuing a relationship with Mother poses a threat to Children. Although we are sympathetic to Mother's difficulties in distancing herself from her abuser, the purpose of these proceedings is to protect Children. *X.S. v. Ind. Dep't of Child Servs.*, 117 N.E.3d 601, 605 (Ind. Ct. App. 2018).

[16] The evidence shows Children need more than Mother is currently able to provide. *R.H.*, 892 N.E.2d at 150 ("Parental rights may be terminated when

parties are unable or unwilling to meet their responsibilities."). Despite her participation in services, Mother is still unable to provide the children with an environment free from domestic abuse. She still makes excuses for her abuser. And she still cannot demonstrate the skills necessary to overcome her long history with domestic violence. Based on Mother's lack of progress in gaining independence from her abuser, we conclude that the trial court did not err in finding that there was a reasonable probability that the conditions that led to Children's removal would not be remedied and that the relationship poses a threat to children's wellbeing. Accordingly, the trial court's conclusions were not clearly erroneous. *See, cf., In re O.G.*, 65 N.E.3d 1080 (Ind. Ct. App. 2016) (reversing the termination of mother's parental rights because she meaningfully engaged in services *and* ended her relationship with her abusive partner).

## II.    Best Interests and Satisfactory Plan

Mother also argues that termination is not in Children's best interests and contests DCS's plan for placement because she believes Father will be able to continue his relationship with Children. Children currently live with their paternal grandmother in Kansas, and DCS plans to adopt Children into that home permanently. Grandmother has expressed a desire for her son, Father, to live in Kansas, too.

We are troubled by the potential for Father to reunite with Children when Mother—the woman he serially abused—may never get that chance. After all, Mother lives in Indiana with her two other children, whose fathers also reside

here. The two children in this case now reside with the parent of her abuser, creating an opening for Father to build a meaningful bond with the children if he so chooses. We are not unsympathetic to Mother's complaint that this result seems fundamentally unfair. But our focus is on Children, not Mother. Our role on appeal is to determine whether the lower court erroneously found termination in Children's best interest. In performing this task, we do not substitute our judgment for that of the trial court. *Best v. Best*, 941 N.E.2d 499, 504 (Ind. 2011). *R.S.*, 56 N.E.3d at 628. When determining the best interests of a child, the trial court looks at the totality of evidence. *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004). Ultimately, the child's interests trump those of the parents. *Id.*

[19] The Court Appointed Special Advocate in this case testified that adoption into Grandmother's home is in Children's best interest. Tr. Vol. II p. 190. Grandmother has cared for Children for a significant portion of their lives. The trial court found Children have adjusted to their home with her in Kansas. Appellant's App. Vol. II p. 173. And although Grandmother wants Father to move to Kansas, she testified she would not let her son interact with Children without first engaging in services. Tr. Vol. II p. 127.

[20] This evidence, along with that discussed in Part I, supports the trial court's conclusions that termination was in Children's best interests and the plan for Children's care was satisfactory. Adoption is generally a satisfactory plan, even where the adoptive family has not been identified. *Lang v. Stark*, 861 N.E.2d 366, 375 (Ind. Ct. App. 2007). Although Mother complains there is no concrete

plan to keep Father away from Children in their adoptive home, this level of detail is not required. *D.D.*, 804 N.E.2d at 268. The trial court apparently believed Grandmother when she said she would protect Children from Father, and we defer to such credibility determinations. *See id.* at 267.

[21] Because Mother has failed to show that either the findings or the judgment of the trial court are clearly erroneous, we affirm.

Bailey, J., and Vaidik, J., concur.